**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:20-CR-7-HAB |
| | ) | |
| STEVEN J. HECKE, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

If this case were a criminal justice course, it would be called "Anatomy of a Criminal Investigation." Twice now, Defendant, Steven J. Hecke, has asked this Court to dissect the investigation leading to his arrest on gun and drug charges. (ECF No. 26). Before the Court is Hecke's Second Motion to Suppress Evidence and his Second Motion for *Franks*[1] Hearing (ECF Nos. 109, 114). As part of those motions, Hecke renews his prior motions to suppress and request for *Franks* hearing. (ECF Nos. 66, 68 and 71). The motions are fully briefed (ECF Nos. 113, 115, 126, 132)[2], making the matters ripe for review. Having reviewed the parties' filings, the Court determines that no *Franks* hearing is warranted on any of the warrants and the Motions to Suppress will be DENIED because the respective judges had probable cause to issue them.

**DISCUSSION**

**I.      Introduction**

The investigation into Hecke's activities began in November 2019 and continued through Hecke's arrest on January 15, 2020. During this two-month span, law enforcement officers

---

[1] *Franks v. Delaware,* 438 U.S. 154 (1978).

[2] Additionally, the parties rely upon briefs they filed as part of the first motions to suppress.

obtained three pairs of state search warrants to track Hecke's truck and cell phone. *See* ECF No. 128, Exs. 2–7. These warrants were based on affidavits from Detective Darren Compton (Detective Compton) of the Allen County Police Department (ACPD) and summarized information obtained, in part, from a confidential informant (CI). After obtaining the initial tracking information, twice renewing the state tracking warrants, and conducting substantial physical surveillance and controlled buys, the Government sought federal warrants for: Hecke's residence on Spring Street in Fort Wayne, Indiana; two storage units; a separate house allegedly used as a stash house on Andrews Street in Fort Wayne, Indiana; Hecke's truck; and his cellular telephone. *See* 1:20-MJ-3 through and including 1:20-MJ-8. Upon execution of the federal search warrants at the various locations, agents found large quantities of drugs, drug trafficking paraphernalia, and guns.

In his first set of motions, Hecke challenged only the issuance of the first two state search warrants that authorized law enforcement to place a GPS vehicle tracking device on a 2001 white Ford F150 registered to Hecke and to obtain cellular telephone records for telephone number 260-409-9567, believed to be used by Hecke in his drug trafficking activities. Hecke challenged the probable cause determination of the state Magistrate Judge as well as Detective Compton's statements in the search warrant affidavit. He argued that the search warrants would not have been issued if Detective Compton provided thorough and accurate information about the criminal history and reliability of the confidential informant working the case. He also argued that if those warrants were invalidated, the exclusionary rule applied to bar all tracking or surveillance data and any later obtained physical evidence that derived from the tracking and surveillance knowledge. *See Wong Sun v. United States,* 371 U.S. 471 (1963). What Hecke did not do in his motions was challenge the factual basis for the federal warrants.

In response, the Government asserted that if Hecke was seeking to exclude the physical evidence against him, Hecke was attacking the wrong set of warrants and the true dispute revolved around the physical evidence obtained from executing the federal warrants. It also asserted that Hecke had not made the substantial preliminary showing necessary to obtain a *Franks* hearing relating to the state warrants, that the Magistrate Judge's probable cause determination was sound, and, in any event, the Government did not intend to seek admission of the data obtained from the state search warrants in its case.

Given the Government's concession that it did not intend to use any of the tracking data it obtained against Hecke at trial, the Court determined that Hecke's motions attacking the state court warrants were moot. (Opinion and Order, ECF No. 96). The Court remarked that while it understood counsel's strategy of invalidating the warrants in piecemeal fashion, the matter was complicated by the later-acquired federal warrants that contained new information to support the probable cause determination. Thus, the Court found that even if Hecke were successful in challenging the initial state warrants, invalidating the later-acquired federal warrants might be an uphill struggle for Hecke.

Hecke welcomed this challenge. As explained above, he has renewed his challenge to the state warrants and, in addition, now adds the federal warrants to the mix. He has requested *Franks* hearings as to both and to suppress evidence obtained from both sets of warrants. The Court turns first to a discussion of the factual basis for the respective warrants, then to the Defendant's arguments that the agents intentionally misled the judicial officers involved in the issuance of the warrants, and finally to the probable cause determinations by the respective judicial officers.

## II.   *The Warrants*

### a.   <u>State Search Warrant Affidavits</u>

3

On November 12, 2019, Detective Compton submitted identical Search Warrant Affidavits (ECF Nos. 77-1 and 77-2) to the Allen County, Indiana, Superior Court seeking a search warrant to place a GPS tracking device on Hecke's vehicle and to obtain cell phone records for a cell phone allegedly used by Hecke as part of his drug trafficking activities. The facts underlying the request for the warrant began with an investigation by Detective Compton in November 2019. Detective Compton received information from an unidentified individual that Hecke was supplying large amounts of methamphetamine throughout Fort Wayne, Indiana. Detective Compton conducted a computer search of public and law enforcement data and determined that Hecke listed a residence of 810 Spring Street, Fort Wayne, Indiana (Spring Street residence). He also conducted a criminal history check which revealed Hecke's 2008 federal conviction for possession with intent to distribute cocaine and possession of a firearm during a drug trafficking offense.

In October 2019, before Detective Compton received this tip, an informant reported to Detective Compton that another individual, BSC,[3] advised the informant that he was being supplied drugs by an individual directly connected with Mexican cartels. No other information is provided about the identity of the supplier or the informant.

On November 6, 2019, the Allen County Drug Task Force and the DEA served a search warrant at BSC's Point West Drive apartment[4] where they located a ½ pound of methamphetamine, small amounts of other drugs, 3 firearms and narcotics distribution items.

---

[3]Detective Compton included the full name of BSC in his affidavit. Even so, the Court refers to him by his initials as the parties have filed the affidavits under seal.

[4]In Hecke's first set of motions, he stated that the affidavit did not say who lived at the Point West Apartment. He is correct that when the affidavit first mentions the search it did not identify BSC as the resident of the apartment. However, on page 5 of the affidavit, Detective Compton summarizes the investigation and references that the search warrant for the apartment was for BSC's apartment. The Government also clarifies in its brief that BSC was arrested after the raid on the Point West Apartment and that during his interview he made statements against his penal interest. The fact of the arrest is omitted from the affidavit.

Investigators interviewed BSC who advised them that his original drug supplier, Jason Wallen, was arrested in August 2019. After Wallen's arrest, BSC became acquainted with a new supplier who had supplied Wallen.[5] This individual was Hecke. BSC provided Hecke's cell phone number 260-409-9567 and told investigators that he used this number to facilitate narcotics deals. He also indicated that while texting Hecke, he used code words to request narcotics.[6] BSC confirmed Hecke's residence and identified Hecke's Ford pickup truck with Indiana license plate TK550NLM. That license plate returned to Hecke at the Spring Street residence.

BSC represented that he started purchasing methamphetamine from Hecke – ¼ pounds  for $1,700-$1,800 and ½ pounds for $2,800-$3,000. Eventually these amounts turned into one-pound quantities for $4000-$5,000 a pound, depending on the quality of the methamphetamine. BSC advised that Hecke would deliver the drugs using his Ford pickup truck. The drugs were vacuum sealed, wrapped in black tape, covered with a red grease, and wrapped in cellophane.

Hecke told BSC that he could get hundreds of pounds of methamphetamine and that he was supplied by the Mexican Cartel. Hecke told BSC that he would sell him 20 pounds of methamphetamine for $70,000 and kilograms of heroin for $35,000.

Text exchanges between BSC and 260-409-9567, the cell number BSC identified as Hecke's, from November 1 through November 3 were in the affidavit. Based on Detective Compton's training and experience he believed these text messages revealed several drug transactions including one for 2 pounds of methamphetamine for $4,000 between Hecke and BSC.

---

[5] A separate investigation by the DEA in November 2019 confirmed that Hecke supplied Wallen. This information is included later in the affidavit.

[6] The code word "headlights," for instance, means methamphetamine.

Additionally, the cell phone analysis located 10 calls between BSC and Hecke's number between October 21 and November 3, 2019.

Apart from the information obtained from BSC, the affidavit contains information received from the ATF that Wallen owed Hecke a $50,000 drug debt for drugs fronted before Wallen's arrest. Wallen's girlfriend returned unsold drugs to Hecke and transferred Wallen's Dodge Challenger, motorcycle, and a camper to Hecke to pay off some of the debt. The provider of this information is not identified in the affidavit. But Agents confirmed that Wallen sold a Dodge Challenger to Hecke and the vehicle was registered to Hecke at the Spring Street residence which corroborated the information the ATF had received.

During physical surveillance on November 7 and November 8, 2019, Detective Compton identified Hecke driving the white Ford pickup truck with Indiana registration TK550NLM. More surveillance by the Allen County Drug Task Force observed Hecke purchase a medium size chest from Menards, and an XL black tote with a yellow lid from Home Depot. Agents observed Hecke meet with a teal Lexus at the Spring Street address. The driver carried a backpack into the residence. Hecke then exited the residence and loaded something from the trunk of the Lexus into the large black tote, carried the tote inside the residence and then returned the empty tote to the trunk of the Lexus. The driver of the Lexus then drove away. Detective Compton stated that from his training and experience it is common for large drug traffickers to use couriers to transport narcotics and money from their suppliers.

Based on this information, the reviewing state magistrate judge determined that probable cause existed to monitor the location of Hecke's truck using a GPS tracking warrant to track where he "secures, buys, and/or stores narcotics in Indiana, or out of state." Additionally, the magistrate judge found probable cause to seize subscriber and communications information for the cell phone

number 260-409-9567, as the phone was part of drug trafficking activities. These warrants were renewed on December 10, 2019, and January 7, 2020. The additional warrants built upon GPS and cell phone data obtained from the first set of warrants.

### b. Federal Search Warrant Affidavits

On January 13, 2020, DEA Special Agent Michael Foldesi (SA Foldesi), a 28-year veteran agent with the DEA, applied for six federal search warrants seeking authority to search two residences, two storage units, Hecke's truck, and his cell phone. SA Foldesi's affidavit incorporated, in part, the information in the affidavits submitted by Detective Compton to obtain the state tracking warrants. But that was not the only source supporting the affidavit. SA Foldesi's affidavit supplemented the original state affidavits with new information, information received through two controlled buys by BSC, information from the state tracking and cell phone warrants, extensive physical surveillance, and information related to the Andrew Street address, later identified as Hecke's stash house.

### 1. *Other Investigation Facts*

SA Foldesi alleged that besides the information first received by Detective Compton that Hecke was trafficking large amounts of methamphetamine in Fort Wayne, a law enforcement database disclosed that Hecke had "three inbound pedestrian border crossings in Nogales, Arizona on October 11, 2018; December 17, 2018; and May 7, 2019." SA Foldesi stated that Mexico is "a source location for drugs" and "these crossings are consistent with coordinating drug trafficking in the United States."[7] (Aff. at 3). SA Foldesi also notes later in the affidavit that historical location data obtained from Hecke's phone shows his phone was in Nogales, Arizona on May 6 and 7,

---

[7] SA Foldesi recounts other facts throughout the affidavit showing that Hecke told the CI in a recorded conversation during a controlled buy that he was supplying the Mexican cartel with rifles.

2019. (Aff. at 20). This information tracks the statements Detective Compton received from BSC that Mexican cartels supplied Hecke.

The Affidavit repeats and confirms the information received by SA Foldesi and Detective Compton from BSC[8] but adds more information about BSC. SA Foldesi writes that BSC was previously convicted of conspiracy to deal methamphetamine, theft, and forgery and the agents obtained his cooperation in exchange for the possibility of BSC earning sentencing consideration on his local narcotics charges (presumably arising from the raid of his apartment).

### 2. *Controlled Buys*

Before turning to the specifics of each of the two controlled buys, it is a fair characterization to say that the Affidavit contains thorough accounts of each of the buys. The Court is summarizing those buys here.

### i.   November 13, 2019, Controlled Buy (Controlled Buy 1)

On November 13, 2019, SA Foldesi, Detective Compton, and DEA Task Force Officer Peter Bradley (TFO Bradley) met with BSC to conduct a controlled methamphetamine buy from Hecke. The typical pre-buy searches were conducted, the CI was outfitted with recording equipment, and he received $2,000 in pre-recorded currency. Detective Compton observed the screen of the CI's telephone show an incoming call from 260-409-9567. The CI confirmed that Hecke was the user of that telephone number. During the recorded call, Hecke coordinated a meeting with the CI to sell him a ½ pound of methamphetamine. Less than an hour later, Hecke was observed leaving his Spring Street residence, entering his white Ford pickup truck, and driving to the parking lot of BSC's apartment. Hecke was observed entering into the CI's apartment at 11:16 p.m. At 11:29 p.m., Detective Compton observed Hecke and BSC walking from the area of

---

[8] The Affidavit refers to a "CI." However, the CI and BSC are the same individuals. The Court uses the terms CI and BSC interchangeably in this Order.

the back door of the apartment building into the parking lot. The CI left briefly in his own vehicle followed by officers. At 11:45 p.m. Hecke left the parking lot in his truck and returned to his Spring Street residence.

The CI returned to the apartment at the direction of officers. Detective Compton retrieved the electronic recording equipment from the CI and recovered a white plastic bag containing a freezer-size, zip-lock bag with a clear, glass-like substance inside. No more contraband was located during the post-buy searches. A field test returned positive for methamphetamine with a bag weight of 237 grams.

Detective Compton and SA Foldesi debriefed BSC. He told them: (1) Hecke entered the apartment and put the methamphetamine package on the coffee table; (2) the CI handed Hecke the $2,000 pre-recorded buy money; (3) Hecke did not count it in the CI's presence; (4) the CI went outside with Hecke to look at a car that was given to Hecke by a third-party as payment of a drug debt; and (5) Hecke did not want the third-party to know where he lived so he explained he had the car dropped off by the third-party at the CI's apartment. BSC identified Hecke from a photo array as the person who sold him the methamphetamine.

Detective Compton and SA Foldesi reviewed the audio and video recording and corroborated the details provided by the CI in the debriefing.

### ii.      December 5, 2019, Controlled Buy (Controlled Buy 2)

Controlled Buy 2 on December 5, 2019, looked much like the first buy. TFO Bradley and Detective Compton searched the CI's vehicle and person. The CI was outfitted with recording equipment and provided with buy money. The CI received a call from Hecke's number and coordinated a ½ pound methamphetamine buy. Hecke met the CI at the Glenbrook Mall parking lot and the two drove separately to the Spring Street residence. Hecke and the CI entered the

residence. Hecke was observed exiting the Spring Street residence and walking toward Andrew Street. A few minutes later Hecke returned to the Spring Street residence and shortly after, surveillance observed the CI leaving the residence.

Detective Compton recovered the recording equipment from the CI and the CI provided Detective Compton with a package wrapped in brown shipping tape, a plastic bag with a white powdery substance, and a plastic bag with a green leafy substance. Post-buy searches of the CI and his vehicle returned no other contraband. The substances were field tested and tested positive for methamphetamine (275 grams), cocaine (1 gram), and marijuana (2 grams).

Detective Compton debriefed the CI who recounted facts much like those observed by the surveilling agents during the buy. Along with those facts, the CI stated that Hecke told him to wait at the Spring Street residence because he had to go to his stash house up the street. While the CI waited in Hecke's bedroom, the CI observed about a half a kilogram of cocaine on a table, a box of marijuana, an UZI firearm with a 30-round magazine, and $8,000 to $10,000 cash on the bed. Hecke returned with the ½ pound of methamphetamine and told the CI it was a higher quality and cost $2,150. The CI further conveyed that Hecke provided a sample of the cocaine and marijuana.

The CI identified Hecke from a photo array. Detective Compton reviewed the audio and video recordings of the buy and corroborated the information obtained from the CI during his debriefing.

### 3.   *Information Obtained from the Earlier Issued State Warrants*

Throughout the Affidavit SA Foldesi uses information obtained from the GPS tracking device on Hecke's truck and the location data from Hecke's phone to report his comings and goings. On November 20, 2019, that information revealed that Hecke's truck was at Public

Storage.[9] Documents obtained from Public Storage through a subpoena confirmed that Hecke rented a storage unit and had paid the rent through April 30, 2020.

More GPS monitoring on December 4, 2019, placed Hecke's truck at Southwest Self Storage in Fort Wayne. On December 11, 2019, Officer Radecki interviewed an employee from Southwest Self-Storage, who provided documentation showing Hecke rented a storage unit there since May 8, 2019. After receiving permission from management. Officer Radecki used his certified narcotic detection K-9 Brix to sniff the outer doors of multiple storage units. Brix alerted to presence of drug odor at the door of Hecke's unit. (Aff. at 19). Brix alerted a second time at Southwest Self-Storage on January 8, 2020. On the same January date, K-9 Brix alerted to the presence of narcotic odor outside Hecke's Public Storage unit, discussed above.

On December 3, 2019, SA Foldesi reported more surveillance with the help of the GPS tracking device. This time, Hecke traveled to Cube Smart Self Storage in Harvey, Illinois. DEA Agents in Chicago observed Hecke's truck drive into the storage units and staying for 4 minutes before exiting the lot. Hecke then drove directly back to Indiana. When Hecke returned to Indiana, agents observed him parking his pickup truck on Andrew Street north of Spring Street. Hecke removed a five-gallon bucket from his truck and carried it into his Spring Street residence. An individual identified as Steven Brinkman and another individual were observed arriving at the Spring Street residence and carried into the residence a "hockey-style bag" which was expanded and appeared full. Further surveillance over the next few hours revealed a high volume of traffic coming and going from Spring Street. Consistent with the GPS tracking information, location data

---

[9]The same day, surveillance on Hecke observed him parked in his truck in front of the Indiana Mexican Bakery with a Hispanic male. Hecke dropped the male off at Don Chava's Mexican Grill. The male exited the truck carrying a plastic grocery bag appearing to agents to be full. The Hispanic male entered into a blue Chevrolet Malibu with an Illinois license plate that returned to Lernardo Sain. Sain has a 2009 arrest for marijuana dealing. After contacting the Bureau of Prisons, Detective Compton learned that Sain and Hecke were incarcerated together in 2012.

from Hecke's cell phone also showed that his phone was in the area of the Cube Smart Self-Storage during the times identified by SA Foldesi in the affidavit.

Tracking data reveals that on December 8, December 17, 2019, and January 5, 2020, Hecke's truck made similar trips to the Cube Smart Self-Storage in Harvey, Illinois and returned to Fort Wayne the same day. Although the affidavit provides scrupulous details of what Detective Compton observed after Hecke's truck arrived back at his residence each time, it suffices to say that activity similar to and consistent with the activity observed after the December 3, 2019, trip to the Illinois storage unit were presented in the affidavit. For instance, each time, Hecke was observed removing white five-gallon buckets from his truck and carrying them into his residence. Again, location data from Hecke's phone confirmed the GPS tracking information for his truck.

On December 23 and December 30, 2019, GPS tracking data on Hecke's truck showed other trips to Public Storage in Fort Wayne. After the December 23 storage unit visit, GPS data showed Hecke's truck visited several residences on that day. Surveillance after the December 30 visit showed Hecke arriving home to the Spring Street address. He carried a filled plastic bag and a backpack appearing to be heavy (based on how Hecke carried it), into the residence.

Based on his training and experience, SA Foldesi provided details connecting the use of the storage units, the trips to Illinois, and the comings and goings from the Spring Street residence to Hecke's drug trafficking activities. For example, SA Foldesi noted that in his experience some drug traffickers travel long distances to obtain drugs from their supplier and that, after receiving a large shipment of drugs, they distribute them quickly so as to not hold large quantities longer than necessary. Additionally, SA Foldesi explained that drug traffickers use multiple storage and stash locations for drugs and drugs proceeds to minimize any loss if one location is compromised.

### 4. *Andrew Street Residence*

12

At pages 16 and 17 of the Affidavit, SA Foldesi details surveillance intending to show Hecke coming and going from a residence located at 1615 Andrew Street (Andrew Street residence) that SA Foldesi believed to be Hecke's stash house. Throughout November and December 2019, the surveillance details show that Hecke left his Spring Street residence, walked northbound down an alleyway toward the Andrew Street residence. Detective Compton observed Hecke entering once through the back gate of the Andrew Street residence and, on a different occasion, exiting through the back gate. (Aff. at 16). During Controlled Buy 2, Hecke was observed leaving the Spring Street residence, walking in the alley toward Andrew Street but could not be seen entering the residence. When Hecke returned from Andrew Street , he provided the drugs to the CI.

Upon returning from one of the Illinois trips, Detective Compton observed a white male identified as Kevin Harris (Harris), helping Hecke unload the five-gallon buckets from Hecke's truck. A computer search of public and law enforcement databases shows Harris had lived at 1615 ½ Andrew Street. SA Foldesi believed that Harris lived in the other apartment at the same residence as Hecke's stash house. Harris has a 1998 conviction for possession of a controlled substance.

On January 8, 2020, a truck registered to Harris arrived in the alley behind the Andrew Street residence. Harris entered the rear fence. About a minute later, Harris was observed leaving through the alley in his truck. Soon after, Hecke was observed walking from the Andrew Street residence to his Spring Street residence. Similar observations were made by officers the next day except this time both Harris and Hecke used keys to access the door and Hecke carried several bags into the Andrew Street residence. SA Foldesi explained that based on his experience, it is common for drug traffickers to use multiple residences, storage units, and the residences of others as stash or distribution locations.

Based on all of the above information, Magistrate Judge Susan Collins found probable cause that evidence of drug trafficking activities would be recovered in the locations sought. She approved issuance of warrants for the two residences, two storage units, Hecke's truck and his cell phone.

### III.     Standard of Review for **Frank's** *Hearing*

Search warrant affidavits are presumed to be valid. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Yet a search warrant is invalid if police officers obtain it by deliberately or recklessly providing the issuing court with false, material information. *United States v. McMurtrey*, 704 F.3d 502, 504 (7th Cir. 2013). In *Franks v. Delaware*, the Supreme Court defined the procedure, evidentiary burdens, and proper remedies associated with a defendant's attack on the truthfulness of statements made in an affidavit supporting the issuance of a search warrant. When challenging the affidavit's integrity, the defendant must make a dual "substantial preliminary showing" of (1) a material falsity that would alter the probable cause determination, and (2) a deliberate or reckless disregard for the truth. *McMurtrey*, 704 F.3d at 508. "These elements are hard to prove, and thus *Franks* hearings are "rarely held" because a defendant seeking a *Franks* hearing "bears a substantial burden to demonstrate probable falsity." *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001) (citations omitted). "Conclusory, self-serving statements are not enough to obtain a *Franks* hearing." *United States v. Johnson*, 580 F.3d 666, 671 (7th Cir. 2009) (citing *Franks*, 438 U.S. at 171). Allegations of falsehood or reckless disregard for the truth must be "accompanied by an offer of proof" such as affidavits or sworn statements. *Franks*, 438 U.S. at 171.

*Franks* also applies to omissions. *United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984) (internal citations omitted). The defendant therefore is not limited to challenging affirmative statements appearing in the warrant affidavit; omissions from the affidavit may also be

challenged. *Id.*; *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990). The defendant bears a substantial burden as to such omissions. He "must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless disregard." *United States v. Souffront,* 338 F.3d 809, 822 (7th Cir. 2003) (quoting *McNeese,* 901 F.2d at 594).

a.  **Application of *Franks* to State Search Warrants**

Hecke challenges the state warrants contending that Detective Compton omitted critical information in his affidavit relating to the reliability and credibility of BSC that render the probable cause determination invalid. Hecke, for instance, notes that the state warrant affidavit contains no criminal history information for BSC, no information on BSC's recent arrest, and no information about any benefit BSC might receive by cooperating with the Government. He also critiques the affidavit more generally, calling it confusing. In turn, the Government argues that none of these criticisms have merit and there is no evidence that Detective Compton intentionally omitted information to mislead the magistrate judge.

It is generally well-understood that warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Ventresca,* 380 U.S. 102, 108 (1965). For this reason, "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir. 1990). *Franks* does not protect against *all* omissions in the affidavit; it protects only against material omissions, meaning omissions designed to mislead, or that are made in reckless disregard of whether they would mislead, a judicial officer's probable cause determination. *See United States v. Clark,* 935 F.3d558, 563 (7th Cir. 2019) ("Our cases do not hold that a *Franks* hearing is required every time some substantial adverse information about an informant's

credibility is omitted from a probable cause affidavit."). The Court finds no such omissions occurred here.

Hecke is correct that Detective Compton did not provide details of BSC's criminal history or a description of the new charges he faced in the affidavit. Hecke contends that had the magistrate known this information, it could have affected the magistrate's assessment of BSC's credibility and, in turn, the probable cause determination. Yet the mere fact that the affidavit omitted information about the informant's criminal background or a motive to provide information against the defendant will not destroy the probable cause determination where the rest of the affidavit establishes reliability. *United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006); see also *Clark*, 935 F.3d at 565 ("Our *Franks* hearing cases show that when police have sufficiently corroborated an informant's tip, the omission of facts pertaining to the informant's credibility may not be material."). Here, as the Government points out, the totality of the circumstances set out in the affidavit supplies the necessary reliability and corroboration of BSC's information.

As for Hecke's assertion that the affidavit is confusing, this is a non-starter. A confusing or sloppy affidavit does not necessitate a *Frank's* hearing. *United States v. Briggs*, 2021 WL 915940, at *20 (E.D. Pa. Mar. 10, 2021 ("But shoddy and sloppy is not [a] threshold requirement necessary to trigger a *Franks* hearing."). The Government acknowledges that Detective Compton's affidavit "could have been more clear" on certain information. (ECF No. 75 at 16). But even so, the affidavit is not robbed of its probative effect just because the court could conceive of better ways to write it. What matters here is that BSC provided fresh and specific details of his interactions with Hecke to Detective Compton. He provided a cell number and address for Hecke, text messages between himself and Hecke in which the code words he described to Detective Compton were used, and he provided information about the delivery vehicle Hecke used when

providing him methamphetamine. And then there is the precise pricing information based on quality of the product that BSC provided as well as the statements against BSC's own interest that he made when he discussed methamphetamine quantities he bought from Hecke. **These facts blunt Hecke's challenge to the reliability of BSC. The information provided by BSC was corroborated by the investigation making the attack upon BSC's credibility and reliability unfounded.**

It is also difficult to fathom how any of the information Hecke points to was crucial to the magistrate's probable cause determination. "[M]agistrate judges ... often know, even without an explicit discussion of criminal history, that many confidential informants 'suffer from generally unsavory character' and may only be assisting police to avoid prosecution for their own crimes." *United States v. Veloz*, 948 F.3d 418, 428 (1st Cir. 2020) (quoting *United States v. Avery*, 295 F.3d 1158, 1168 (10th Cir. 2002). And when it comes to BSC, Detective Compton not only named BSC fully in the affidavit but provided information of BSC's own drug activities that did not place BSC in the best light. BSC's apartment had been raided yielding drugs and guns and BSC admitted to several months of personal drug acquisitions. *See United States v. Harris*, 403 U.S. 573, 583-84 (1971) ("Admissions of a crime. . .carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search."). Considering all the other information presented to the magistrate, including the ATF information related to Wallen's transfer of his Challenger to Hecke and the independent surveillance conducted, the Court cannot conclude that the information allegedly omitted would have been material to the probable cause determination. *United States v. DeLong,* 2022 WL 823881, at *7 (N.D. Ill. Mar. 18, 2022) (denying *Franks* hearing where "[a] detailed description of Goodwin's prior narcotics trafficking, prison sentence, witnessing another crime involving a death, prior cooperation with law enforcement, or any similar information was not necessary or critical to a judge's probable cause determination.").

The high standard necessary under *Franks* to warrant a hearing has simply not been met here. Not only are the alleged omissions immaterial to the probable cause finding, but Hecke has not shown that they were intentional or reckless. *United States v. Larry,* 2021 WL 38006, at *3 (N.D. Ind. Jan. 5, 2021) ("An omission without a corresponding assertion of intentionality, recklessness, or a demonstration of materiality does not create a basis for a Franks hearing."). Hecke has not offered direct or circumstantial evidence of Detective Compton's intent. Without it, the Court cannot authorize a *Franks* hearing. Hecke's request for a *Franks* hearing related to the state warrants is DENIED.

### b.  **Application of *Franks* to Federal Warrants**

The outcome is the same for Hecke's challenge to the federal warrants. Hecke challenges only the facts in the affidavit related to the two controlled buys. He ignores the bulk of the information in the affidavit, focusing instead on the video and audio evidence of the controlled buys which he argues do not support the events set out by SA Foldesi in the affidavit. To this end, he contends that there are both omissions from the affidavit and affirmative misstatements in it.

For its part, the Government argues that SA Foldesi's statements were not false or inaccurate, that he did not knowingly or recklessly mislead the judge, and that any omissions from the affidavit were not material.  The Government also contends that Hecke reads information into SA Foldesi's statements in the affidavit and, at times, construes his words in an overly technical manner rather than using common-sense.

Despite the Government's contention that Hecke engages in an overly technical reading of the affidavit, Hecke seemingly challenges the controlled buy procedures and believes information from Controlled Buys 1 and 2 is either omitted or misrepresented in the affidavit. He has submitted the video and audio recordings from the two buys to support his contentions. The Court has

reviewed these recordings and, on the whole, they do not, as Hecke asks the Court to believe, detract from the statements in SA Foldesi's affidavit, rather they corroborate them on nearly every fact. Nonetheless, the Court looks at Hecke's specific contentions.

For Controlled Buy 1, Hecke claims that SA Foldesi erroneously stated that the pre-buy search of the CI and his apartment were recorded. This representation is befuddling to the Government since SA Foldesi wrote in the affidavit: "Detective Compton conducted a pre-buy search of the CI's Fort Wayne apartment and the CI's person, and no contraband was located." (Aff, at 5). The next sentence reads "CI was outfitted with an audio and video recorder and transmitter." (*Id.*). Nowhere does SA Foldesi suggest that the pre-buy search was recorded and a common-sense reading of his statements is that after the pre-buy search, the CI was outfitted with the recording equipment. But even if Hecke read these statements differently, he offers no proof that SA Foldesi lied about Detective Compton conducting a pre-buy search.

Next, Hecke points out that the CI is left unattended in his apartment and is off camera for a period. Other than to mention this fact, Hecke does not explain how this fact helps his cause or contradicts anything in the affidavit. Hecke also believes the video recording of Controlled Buy 1 contradicts what the CI told SA Foldesi and that SA Foldesi's statement that "[y]our affiant and Detective Compton observed Hecke placing a package on the table" is false. Hecke contends that the video does not show that he placed a package on the table.

Finally, Hecke objects to SA Foldesi's summary in the affidavit of the recorded call between the CI and himself. SA Foldesi wrote, "This phone call was recorded, and during the call, Hecke coordinated a meeting with CI in order to sell a half-pound of methamphetamine." Hecke does not dispute the call occurred; rather, he disputes SA Foldesi's characterization of what transpired on the call.

For Controlled Buy 2, Hecke questions SA Foldesi's recitation of the events. At page 11, SA Foldesi discusses Detective Compton's debriefing of BSC after the buy. SA Foldesi writes that when Hecke and the CI arrive at Hecke's Spring Street residence "Hecke told CI to wait there at his residence because he had to go to his stash house up the street." Hecke asserts that this is erroneous information intended to mislead the magistrate. Instead, he points out that in the video you can hear him say, "I got to run up the block real quick." There is no mention of a stash house.

The Government responds to these contentions with two, well-taken, arguments. First, the Government emphasizes that the fact that a controlled buy could have been conducted to "provide an even higher level of confidence does not imply that probable cause is missing." *United States v. Glenn,* 966 F.3d 659, 661 (7th Cir. 2020). Hecke's observations that BSC was left unattended or that the agents should have recorded the pre- and post-buy searches attack the controlled buy process itself, not what information from that process wound up in the affidavit. If Hecke is challenging how the controlled buys occurred, this is not a *Franks* issue. What matters for *Franks* is whether Hecke has shown that based on the process used the affiant intentionally mislead the judicial officer about what occurred. No such proof has been offered.

The Government also relies on the considerable leeway the courts give to officers to interpret and evaluate events unfolding before them. *See generally Heien v. North Carolina,* 574 U.S. 54 (2014) (quoting *Illinois v. Rodriguez,* 497 U.S. 177, 185 (1990) ("[W]hat is generally demanded of the many *factual determination* that must regularly be made by agents of the government … is not that they always be correct, but that they always be reasonable."). "A statement in a warrant affidavit is not false merely because it summarizes or characterizes the facts in a particular way." *United States v. Hare*, 772 F.2d 139, 141 (5th Cir. 1985).

The Government asserts that it was reasonable for SA Foldesi to believe, given the circumstances of Controlled Buy 2 that when Hecke stated he had "to run up the block real quick," once he and BSC got to Hecke's Spring Street residence that he was going to his stash house to retrieve the drugs he was about to sell. Given SA Foldesi's expertise in investigating drug offenses and his knowledge of the present drug investigation, the Government contends that it was certainly a logical and permissible conclusion by SA Foldesi that Hecke used a stash house. Likewise, when SA Foldesi summarized what occurred during the recorded call, the Government believes this was a reasonable interpretation of the conversation's content and not a misrepresentation.

The Court agrees with the Government. Some representations in the affidavit were based on inferences drawn from SA Foldesi's training and experience, as well as his knowledge of the facts of the case. Hecke has offered no proof that there was any intent to mislead the magistrate or that any of the inferences drawn would have changed the probable cause determinations for any of the federal warrants. Thus, the Court perceives no basis for concluding that these statements were knowing or reckless misrepresentations or omissions of material fact.

In short, the alleged omissions, or erroneous statements from the controlled buys fall far short of the heavy burden that a defendant must satisfy to obtain a *Franks* hearing. Defendant's motion fails.

## IV.    *Probable Cause*

Having found no omissions or material misrepresentations in either the state or the federal warrants, this Court defers to the warrant-issuing judge's determination of probable cause if there is substantial evidence in the record to support the decision. *United States v. Koerth,* 312 F.3d 862, 865 (7th Cir. 2002). When an affidavit is the only evidence presented to a judge to support a search warrant, as it is here, the validity of the warrant hinges on the strength of the affidavit. *United*

*States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009). A search warrant affidavit establishes probable cause when, based on the totality of circumstances, it "sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Mykytiuk*, 402 F.3d 773, 776 (7th Cir. 2005) (citing *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003). "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008) (ellipsis and brackets omitted).

For the state warrants, the facts set out in the affidavit were more than enough to justify the belief by a prudent person that evidence of drug trafficking activities would be found through use of a GPS tracking device and data from the cell phone. The information provided to Detective Compton came from a CI who provided confirmed and reliable information. This was evident from the facts in the affidavit itself; it was unnecessary for Detective Compton to state his opinion of the CI's reliability when the information the CI provided was confirmed time after time. The affidavit also provided independent investigative facts and surveillance which only strengthened the probable cause analysis. The probable cause finding of the state magistrate was a sound one.

So, too, the information in the affidavit for the federal warrants leaves no doubt that the Magistrate Judge properly determined probable cause. She had before her a 26-page affidavit that detailed with specificity the times and dates of interactions between the CI and Hecke – including two controlled buys; Hecke's comings and goings from the Spring Street and Andrew Street residences; his multiple trips to storage units; his prior criminal history and his association with other drug felons; and his repeated trips to a storage unit in Illinois. Together with this information, she had before her the representations of a 28-year DEA veteran connecting the detailed

information with the drug trafficking trade. Based on all this, the Court has little trouble concluding that the totality of the circumstances supported the magistrate judge's probable cause.

### **CONCLUSION**

For the reasons above, the Defendant's Motion to Suppress and Request for *Frank's* Hearing (ECF No.'s 109, 114) are DENIED. The Court also DENIES the Defendant's renewed arguments relating to ECF No.'s. 66, 68 and 71. The Court shall set this matter for trial by separate minute entry.

SO ORDERED on April 25, 2022.

s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT