UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | Cause No. 1:20-CR-7-HAB |
| STEVEN J. HECKE, ) | |
| Defendant. ) | |

## OPINION AND ORDER

**"To succeed in life, you need two things: ignorance and confidence."**

■ **Mark Twain**

Defendant Steven J. Hecke ("Hecke"), armed with an over-abundance of confidence and a healthy dose of ignorance, is facing a life sentence for his "success" in the drug trafficking trade plus a consecutive 25 years for using firearms while doing it. Before the Court are Defendant's objections to the Presentence Investigation Report (ECF No. 202). Defendant did not request an evidentiary hearing and the parties agreed to rely on the evidence presented at trial to support their respective positions and the exhibits attached to their respective sentencing memoranda. (ECF No. 214). The objections are now fully briefed (ECF Nos. 230, 233) and are ripe for determination.

## DISCUSSION

A jury convicted Hecke of two counts of distributing methamphetamine, one count of maintaining a drug-involved premises, one count of possession with intent to distribute methamphetamine and fentanyl, and two gun counts for violating 18 U.S.C. §922(g)(1) and §924(c). To say that Hecke was involved with massive amounts of drugs and many firearms is no

exaggeration – at trial, the Government displayed the drugs and guns to the jury covering three tables with the evidence.[1]

The probation office prepared a Presentence Investigation Report (PSR, ECF No. 208) and determined that, including relevant conduct, Hecke was responsible for converted drug weights of 224,709.76 kilograms. (PSR ¶¶ 37, 38). This quantity yielded a base offense level of 38. The officer also assessed Hecke with various enhancements: a two-level enhancement under U.S.S.G. §2D1.1(b)(2) for making credible threats of violence (PSR ¶¶ 39, 55); a two-level enhancement for maintaining a drug premises under U.S.S.G. §2D1.1(b)(12) (PSR ¶¶ 40, 56); a two-level enhancement under U.S.S.G. §3B1.1(c) because the defendant was an organizer, leader, manager, or supervisor over co-defendant Samuel Battell ("Battell") (PSR ¶¶ 41, 58); and a two-level increase under U.S.S.G. §3C1.1 because defendant attempted to obstruct or impede the administration of justice related to the investigation or prosecution of this offense. (PSR ¶¶ 42, 59). After application of enhancements, Hecke's adjusted offense level for the drug offenses was 46. (PSR ¶¶ 43, 60).

As for the firearms offenses, the probation officer noted that the guideline for a violation of §924(c) is driven by U.S.S.G. §2K2.4 which provides that the guideline sentence is the term of imprisonment required by statute. (PSR ¶¶ 45, 61). Because the defendant had a prior §924(c) conviction, the term of imprisonment required by statute is a 25-year consecutive sentence (PSR ¶¶ 110, 111). As for the §922(g)(1) offense in Count 8, the probation officer noted that the drug offense and felon in possession offense do not group under the "same harm" rule in U.S.S.G. §3D1.2(c). The officer applied two enhancements, a four-level enhancement because the offense involved more than 8 firearms and a two-level enhancement because one of the firearms was

---

[1] Veteran Special Agent Schneider testified that he had never seen the amount of methamphetamine displayed on the evidence tables in one of his cases.

stolen. After application of these enhancements the officer calculated an adjusted offense level of 28 for the §922(g)(1) violation (PSR ¶s 48). Even so, after application of the grouping rules, the greater adjusted offense level applied, meaning that Hecke's adjusted offense level of 46 on the drug counts was the applicable total offense calculation. But, perhaps not remarkably, even Hecke's offense level overachieved the offense level designations in the guidelines which tap out at an offense level of 43. When the total offense level is calculated above level 43, the offense level will be treated as a level 43. (PSR ¶75). With Hecke's criminal history category of II, he faces a sentence of life on the drug offenses and a consecutive 25 years on his §924(c) count.

Hecke objects to the various enhancements applied to the drug offenses and challenges the drug quantity calculation, mostly on policy grounds.[2] The Court turns now to the Defendant's arguments.

**A.     Credible Threats of Violence**

Section 2D1.1(b)(2) of the Sentencing Guidelines instructs sentencing courts to increase the base offense level by two levels "[i]f the defendant used violence, made a credible threat to use violence, or directed the use of violence." U.S.S.G. § 2D1.1(b)(2). The PSR relies on text messages presented at trial from Hecke's cell phone threatening multiple individuals with harm and violence either by him or by invoking members of the Sinaloa Cartel. (PSR ¶ 32). The PSR states that in the messages, Hecke threatened the family members of some of these individuals by telling them that cartel members had their addresses and the addresses of their family members. Additionally, while the case was pending the confidential informant received threatening

---

[2]Yet, even if he succeeds on all his objections to the enhancements (not the drug quantity), the best Hecke can do under the guidelines on the drug offenses is an offense level of 38 that, when combined with his criminal history category of II, would yield a guidelines range of 262-327 months followed by a consecutive 25 years. Hecke is 47 years old. In the end, even if he were successful on all his objections ***and*** received a low-end guidelines range of 262 months, Hecke is still looking at spending the rest of his life in federal prison.

communications and Battell, who testified for the Government at Hecke's trial, had his jaw broken by inmates during an attack on him.

The Government concedes that it lacks evidence of sufficient reliability to meet its burden that Hecke directed the jail violence against Battell. But it bolsters the other facts in the PSR by reference to the specific language of some threats in the text messages Hecke sent. For instance, the Government points out that Hecke texted an individual to "stop pointing out to people where my mom lives[3] …My peeps are mad at you…I told them to take it easy and not harm you." (Gov't Tr. Ex. 233 at 53/200). Hecke texted the same number stating, "I am giving all the addresses to south." (Gov't Tr. Ex. 231 at 789). Other text messages provided by the Government include:

- Text to (419) 860-8904: "I recommend peace … or we start going to every place on the list…If any problems come to my mothers house I will blame you." (Gov't Tr. Ex. 233 at 5/308)

- "I just heard you threatened my peeps … I may not be able to control them now … Calling south in two hours to get them prepared if necessary … I hope you have some big guns … They are vested up … And strapped up too." (Gov't Tr. Ex. 233 at 8/308, 12/308, 30/308, 42/308)

- "I am not joking about addresses either … They have your dad's too." (Gov't Tr. Ex. 233 at 12/308)

- "I'm willing to die for my respect. Are you? They have all addresses. How it will go, you drop off money, kids are okay, but you will be alone. If not, whomever it is, I will consider a threat. Not good…" (Gov't Tr. Ex. 233, at 30/308)

The Government contends that, when combined with other evidence at trial, specifically that Hecke was affiliated with members of the Sinaloa Cartel (his "peeps") and boasted that he had firearms at the ready,[4] the veiled (or perhaps not so veiled) threats about the activities in the "south"

---

[3] Evidence at trial established that Hecke's mom lived at Hecke's drug storage and distribution house.

[4] At trial, Battell testified credibly that he met an individual identified by Hecke as a person from the Sinaloa cartel. Battell stated he traveled to a property with this individual to pick up a motorcycle and a four-

in the texts were references to that cartel. Similarly, the Government offers evidence from another cell phone found in Hecke's possession that contained text messages referencing Mexico, such as this:

> We are friends of Stevens … We are here to assist him in anyway possible…We have already been by your house on Weisser Park … We are now going to look at your fathers house…We are here by orders of our mutual friends in Mexico.

(Gov't Ex. 233 at 18/308).

Finally, the Government relies on Special Agent Schneider's expert trial testimony[5] that these and other text communications from Hecke were threats or would be perceived as threats and that "south" referred to "Mexico and potentially the Sinaloa cartel members." (Transcript of Trial Proceedings, Day 4, ECF No. 236 at 206-210, below, "Tr. IV at __"). SA Schneider testified that threats are common to induce compliance and such threats are effective:

> You're in an illegal activity already, you may have or may not have guns already… sometimes you're fronted drugs which means you get it on credit, and you're expected the next time you meet or under the obligation, whatever you describe or agree upon, you'll make payments. If you're not making those payments, sometimes getting beat up or getting an arm broken or having to give your vehicle, or the threat of being shot or the threat of somebody you love or your family, or friends or your property being destroyed, those threats work when people believe that they'll happen…
>
> … Q. In general are confidential human sources or just others in the drug world, are they afraid of Mexican cartels?
>
> A.  Are they afraid?
>
> Q.     Yes…

---

wheeler, went to a hotel in Fort Wayne, and met with a group of four or five Mexicans. Battell testified that Hecke "advised me these were the cartel." (Tr. IV at 27-29). Evidence was also presented that Hecke directed Battell to acquire semi-automatic assault rifles, other rifles, and handguns to send to the cartel. (*Id.* at 30). Battell testified that he "easily" transferred between 50 and 100 weapons to Hecke for his drug debt. (*Id.* at 32).

[5] The Court recognized SA Schneider as an expert in "drug trafficking." (Tr. IV at 154-155).

> Q.      Is there any special reason[] why individuals may have more fear of the Mexican cartels?
>
> A.      Same reason here in United States, people have a fear of gangs. They do things that are illegal, they do things by force or death or injury or kidnapping. And its an organization that even sometimes these local drug gangs have access to money, and firearms or information that you feel that you're safe, but you think of a very large organization that's worth millions of dollars or more and the access that they have to computer systems. Firearms, to security for themselves, or the availability to send people out.
> I mean, here in Fort Wayne, Indiana we do have members of the Sinaloa cartel. They've had members of the MS-13 that have been here. So people are afraid of the long reach that they believe cartels have.
>
> Q.      Would you consider the Sinaloa cartel to be among those that are violent in Mexico?
>
> A.      Yes.

(Tr. IV at 166-167). Given this testimony, the other evidence at trial, and the text messages, the Government believes the enhancement for making credible threats of violence is warranted.

In response, Hecke argues that there is nothing specific in the text messages pointing to any actual use of violence by Hecke or of Hecke directing someone else to use violence. He claims that the texts are vague and require interpretation from the Government to be perceived as threats. For instance, he argues that there is no evidence that the recipient of the texts referencing Hecke's "mom's house" knew that this was where Hecke maintained and stored some drugs. Hecke offers an alternative reading of the term "peeps" to mean "people or friends."

The Government agrees that these messages require some interpretation and notes that in the context of drug trafficking, the reading it proposes makes the most sense, as explained by SA Schneider. The Government also agrees with Hecke that the messages do not specifically direct anyone to take a hostile action against another person nor do they evidence an actual use of violence by Hecke himself. But the enhancement applies to more than just direct acts or directing violent acts by others, it applies to "credible threats to use violence" which the Court finds are

amply proven here. The very nature of a "threat" is that it involves an intention to cause reasonable fear in another. "But a threat is a threat, even if the speaker never intends to carry it out." *United States v. Johnson*, 64 F.4th 1348 (D.C. Cir. 2023) (citing *Elonis v. United States*, 575 U.S. 723, 740 (2015) (defendant violates federal fraud statute where he knows "the communication will be viewed as a threat").

Here, from all the evidence in the trial record, the Court has little trouble concluding that Hecke intended the statements in the texts he sent to others to invoke fear in the recipients and ensure their compliance – even if he never carried them out or had others carry them out for him. As with any communication, context matters. Hecke was not texting his friends to come over for a nice evening and a cold brew, as suggested by his innocent interpretations of the text language. He was conducting a drug business. Individuals involved in the drug trade attempt to disguise the content of their discussions to camouflage their illegal activities. This is borne out in the trial evidence and confirmed by SA Schneider's testimony. (Tr. IV at 206, examining language of texts from Hecke and confirming the text is a threat; at 209, testifying that Hecke is daring the text recipient to come over for violence). Reading the language in the context of Hecke's known relationship with the Sinaloa cartel bolstered the credibility of the threats and the likelihood that they would be carried out by *someone* and, for this reason, the Court finds the enhancement for making credible threats of violence is properly applied. Defendant's objection is OVERRULED.

**B.      Role in the Offense**

Section 3B1.1 of the Sentencing Guidelines provides for up to a four-level increase in the offense level for a defendant's aggravated role in the offense. A defendant's offense level is increased by four levels if he is an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" and by three levels if he was a "manager or

supervisor" of the same. U.S.S.G. § 3B1.1(a)–(b). Relevant here, a defendant who is an organizer, leader, manager, or supervisor "in any criminal activity other than described in (a) or (b)" is increased by two levels. §3B1.1(c). The probation officer determined that the two-level increase was warranted because Hecke used Battell as his "right hand man" to obtain vehicles, firearms, and other items such as ballistic vests, for Hecke to deliver to Mexico. Hecke objects to this enhancement claiming that he was a mere supplier to Battell and nothing more.

The Guidelines do not explicitly define the terms "organizer," "leader," "manager," or "supervisor," but the accompanying commentary offers a list of factors that courts can use to distinguish between the organizer or leader roles and the manager or supervisor roles. These factors include the exercise of decision-making authority, the nature of participation in the offense, the recruitment of accomplices, a claimed right to a greater share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the offense, and the degree of control exercised over others. § 3B1.1 n.4. Ultimately, in applying the enhancement, the court must conduct a practical inquiry and make a "commonsense judgment about the defendant's relative culpability given his status in the criminal hierarchy." *United States v. House*, 883 F.3d 720, 724 (7th Cir. 2018), quoting *United States v. Dade*, 787 F.3d 1165, 1167 (7th Cir. 2015).

Hecke contends that he was supplying Battell with drugs – fronting them to him – for Battell to deal to his own customer base. Hecke argues that Battell had a "thriving drug business" before meeting him and Hecke simply filled the void when Battell's prior supplier was no longer available. Hecke is not entirely wrong. Battell testified that he "absolutely" had his own customer base and was supplied methamphetamine and heroin by Hecke.[6] (Tr. IV at 33, 35). Battell testified that he sold so much methamphetamine to his own customers that he received a discount from

---

[6] Battell also bought one batch of $1,000 fake percocets (Perc 30's) from Hecke. (Tr. IV. at 37).

8

Hecke of between $1,000 to $1,500 a pound. But the trial testimony, and Hecke's own statements tell the rest of the story, one that is not favorable to Hecke.

Battell testified that he first met Hecke in the late summer of 2019 and began purchasing half-pound quantities of methamphetamine from him. Battell partially paid for the methamphetamine and the rest Hecke fronted him. Battell then noted that his relationship with Hecke began to change over time and it "grew to a much larger scale." (Tr. IV. at 22). He explained that he began buying anywhere from 5 to 10 pounds a week and eventually Hecke considered Battell his "right hand man." (*Id.*: "That was a term [Hecke] used."). Battell testified he "dealt a lot with cars, a lot of guns...his people[7] were willing to buy almost anything and everything, so it was four-wheelers to motorcycles, cars, guns, a lot of merchandise." (*Id.* at 23). Battell explained that he was obtaining vehicles for Hecke for the cartel in Mexico. (*Id.* at 24). At times, Hecke would make specific requests of vehicles he wanted Battell to obtain, — for example, trucks able to pull trailers down to Mexico. (*Id.* at 25). Battell would have the vehicles looked at by his mechanic "to make sure they were in top shape." (*Id.* at 26). Battell was also obtaining firearms for the cartel. He testified that Hecke would instruct him on the type of guns the cartel wanted and, at one point, Hecke showed pictures to Battell of weapons being requested. (*Id.* at 30: "The most strict instruction was no shotguns."; *id.* at 31: "[Hecke] actually showed me pictures before of weapons that were being requests, big assault rifles…").

Battell testified reliably at trial. But even if the Court could find fault with some of the testimony, the Court cannot when it comes to the particular role Battell played in Hecke's enterprise. Indeed, on this point, the Defendant hung himself by his own petard in a recording from one of the controlled buys. In the buy recording from November 13, 2019, Hecke stated Battell

---

[7] Battell testified that "his people" meant the Sinaloa cartel. (Tr. IV. at 23).

was his "right hand man." Hecke told the informant that he was busy with drug trafficking tasks and that he had "tried a couple of different number two's and no one has worked out." Hecke went on to physically describe Battell, who is 6'5" tall and a former baseball pitcher throwing 92 miles an hour, as his new number two. If that isn't enough to show that Hecke had recruited Battell into his operation, during Battell's testimony, the Government introduced text messages from Hecke to Battell, one reading, "Appreciate all you do for me *and the team*." (emphasis added). Battell testified that he was receiving praise from Hecke in that message "for all the work I was doing for him. I was taking a lot off his plate so he could focus on other things." (Tr. IV at 58). All this evidence collectively and using commonsense, points to Hecke being an organizer, leader, manager, or supervisor over Battell. He instructed and directed Battell about what types of items (guns and vehicles) his "team" desired and he identified Battell to others as his number two man. The Government has sustained its burden and the two-level enhancement under U.S.S.G. §3B1.1(c) is appropriate. The Defendant's objection is OVERRULED.

### C. Obstruction Enhancement

The obstruction of justice sentencing enhancement provides that a defendant's offense level shall be increased by two levels if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense ....

U.S.S.G. § 3C1.1. The application notes provide a non-exhaustive list of examples of obstructive conduct, which includes the commonly thought of obstructive behaviors such as witness intimidation, perjury, destroying evidence, escaping custody, and so on. *Id*. cmt. n.4. Obstructive conduct can "vary widely in nature," *id*. cmt. n.3, and the enhancement envisions circumstances

10

beyond conduct directly connected to the commission of the crime that no less obstructs and impedes the administration of justice.

The probation officer assessed the enhancement based on evidence of messages sent by Hecke from his jail tablet to Brian Conder (Conder), the confidential informant in this case.[8] The Government has provided the content of those messages to the Court. The first, sent by Hecke on April 27, 2020, at 4:13 pm states, "Hello ci 753. What's up." (ECF No. 230-1 at 3). The second, sent about an hour later from Hecke states:

> My mandatory minimum is so high that [I] have to go to trial. That means you will have to testify RAT. Everyone one will see your face. You are a liar and a fuckin coward. I know you were looking at 15 to 20 year minimum. Guess what? You will have to do sometime [sic]. The feds let no one go. I hope to see you in prison. I want to personally thank you.

(ECF No. 230-1 at 4). The probation officer believed these text messages evidenced an attempt by Hecke to "threaten, intimidate, or otherwise unlawfully influence" Conder's testimony.

"'[U]nlawfully influencing' a witness means intentionally engaging in conduct having a natural tendency to suppress or interfere with the discovery of truth." *United States v. House*, 551 F.3d 694, 699 (7th Cir. 2008) (citing *United States v. Wright*, 37 F.3d 358, 362 (7th Cir. 1994)). "The context of the statements is important." *United States v. Barber*, 937 F.3d 965, 972 (7th Cir. 2019). In short, "an attempt to influence a witness improperly is an attempt to obstruct justice under Guideline § 3C1.1 even if the defendant did not threaten the witness." *Wright*, 37 F.3d at 362. Of course, "[m]aking any sort of statement to a witness is not enough; rather, a defendant must make the statement intending for it to affect whether or not the witness will appear at trial.

---

[8] The probation officer also found that Battell's jail assault could warrant the enhancement if directed by Hecke, but both the Government and probation appear to concede that no evidence supports these facts. There does exist some evidence that Hecke may have viewed a post-arrest interview of Battell just before the attack on Battell but that evidence is not sufficiently reliable for the Court to determine that Hecke, in fact, directed the attack.

11

At the same time, this circuit's cases hold that a mere attempt to influence a witness is enough, regardless of whether it succeeds." *House*, 551 F.3d at 699. The courts use "an objective standard to determine whether a given action is an attempt to obstruct justice, rather than evaluating the subjective intent of the defendant." *Id.* Section 3C1.1 "'requires specific intent to obstruct justice,' and the burden rests on the Government to establish such intent by a preponderance of the evidence." *United States v. Dale*, 498 F.3d 604, 608–09 (7th Cir. 2007).

This Court's review of the texts from Hecke to Conder reveals that the language sufficiently shows by a preponderance of the evidence that Hecke had the specific intent to obstruct justice by influencing Conder's participation as a witness at trial. Hecke's texts referred to Conder by his confidential informant number, called him a rat, told Conder that he was going to trial and Conder would have to testify, and Conder would need to show "everyone" his face in court. There is no logical reason for Hecke to make such statements to Conder from prison except to attempt to obstruct justice by either threatening Conder outright or influencing Conder's testimony. And, because "context is important," the Court believes that objectively a reasonable person in Conder's position would understand that a "personal thank you" in the prison context is a serious threat. Given the sentence Hecke was facing, he was speaking tongue in cheek and did not intend to shake Conder's hand and give him an "atta boy" to thank him for testifying and helping the Government put him in prison for life. Thus, because logic and reason prevail in this context, the Court finds that it is more likely than not that Hecke intended to influence or threaten Conder by sending the messages to him. The enhancement for obstruction applies and the objection is OVERRULED. See *Barber*, 937 F.3d at 972 (noting that defendant's inscription on a holding cell's bench "TELL ANTHONY CHIPPS TO THINK B4 H GET ON THERE N LIE" was more likely a

communication of dissatisfaction with a co-conspirator's decision to testify against the defendant than a desire to warn him against perjuring himself).

**D. Drug Quantity**

Finally, Hecke challenges the calculation of the drug quantity which yields a base offense level of 38 under §2D1.1. Hecke asserts that the base offense level of 38 overestimates the significance of the drugs for which he is responsible. He makes a series of uncompelling arguments to sway the Court that the Guidelines do not adequately reflect his criminal conduct.

The standards that apply to drug-quantity findings at sentencing are well established:

> [A] preponderance of the evidence is all that is required for a factual finding of drug quantity under the Sentencing Guidelines, due process concerns notwithstanding. Determining drug quantities under the Sentencing Guidelines is often difficult, and district courts may make reasonable though imprecise estimates based on information that has indicia of reliability.... At the same time, ... a district court choosing among plausible estimates of drug quantity should normally err on the side of caution.

*United States v. Bozovich*, 782 F.3d 814, 818 (7th Cir. 2015) (citations omitted) (internal quotation marks omitted). The relevant quantity includes the drugs the defendant himself distributed or possessed. But when a defendant is involved in jointly undertaken criminal activity, he is accountable for the actions of others within the scope of and in furtherance of that activity, and reasonably foreseeable to him. U.S.S.G. § 1B1.3(a), Application Note 3(A); *see also United States v. Brown*, 822 F.3d 966, 976 (7th Cir. 2016). Ultimately, it is the Government's burden to prove the drug quantity.

After considering relevant conduct, the probation officer calculated a converted drug weight of 164,834.56 kilograms[9] which, alone, warranted the maximum base offense level

---

[9] The drugs included in this calculation are set forth in paragraph 37 of the PSR and included the methamphetamine (actual) from two controlled buys, methamphetamine (actual) found concealed in three drywall mud buckets, and methamphetamine (actual) and fentanyl discovered in the defendant's bedroom.

possible under the drug quantity table in §2D1.1(c)(1). The officer also noted that another 66 pounds of methamphetamine (not actual) would have led to a total converted drug weight of 224,709.76 – over 2.5 times the maximum amount for which the guidelines assess offense levels. But because Hecke's quantities had already maxed out the drug quantity table, the probation officer did not include the other 66 pounds in the calculation. (PSR ¶38). So too, the officer did not include amounts listed in the various drug ledgers. The probation officer also noted in his addendum that *even if* the only drugs counted were the actual methamphetamine recovered from the controlled buys, the Defendant's bedroom, and the three drywall buckets, Hecke's base offense level would remain 38 based on 8.059889 kilograms of actual methamphetamine. U.S.S.G. §2D1.1(c)(1)(directing that level 38 applies to 4.5 kilograms or more of actual methamphetamine). Thus, as the Government points out, anyway Hecke tries to spin or exploit the quantity calculation leads to the same outcome – a base offense level of 38.

Hecke, though, argues that the government did not test for d-methamphetamine hydrochloride, which is "ice" under the commentary following the drug quantity table. But here, the drug quantity calculation was based on the actual methamphetamine weight rather than the total mixture or substance amount of "ice." Further, at trial the actual methamphetamine weight from the controlled buys, the three drywall buckets and the amounts in Hecke's bedroom were supported by the uncontested testimony of six chemists. So Hecke's argument that the Government should have tested substances for "ice" when they already had sufficient actual methamphetamine evidence to drive the guidelines calculation is a non-starter.

Hecke next argues that drug purity is not a meaningful criteria to determine a defendant's culpability in the drug trade and that if purity did not influence the calculation, his base offense level would be 34 rather than 38 based on a mixture calculation rather than an actual

14

methamphetamine calculation.[10] He urges that this is unfair and asks the Court to deviate from the guidelines so that all methamphetamine, regardless of purity, is punished equally. He argues that punishing defendants for distributing higher purities of methamphetamine is not based on empirical information that higher purity rates equate to more societal harm.

This argument has been made and rejected in this Circuit and many others. *See United States v. Bostick*, 910 F.3d 348, 350-51 (7th Cir. 2018) (upholding refusal of district judge to vary sentence based on the 10:1 ratio of actual methamphetamine to methamphetamine mixture); see also, *United States v. Elkins,* 1:18-CR-79 DRL-SLC, ECF No. 132 (N.D. Ind. February 4, 2020) ("[T]he court is not of the view that drug weight and drug purity have nothing to do with culpability, the severity of a drug offense, or its harmful impact on the public. The street places greater value on such features as weight and purity, and it does so for self-evident reasons in the drug trade. The court is not inclined to ignore these realities."). As the Courts that have rejected Hecke's argument have noted, "the Guidelines reflect the harsh societal harms caused by the production, distribution, and use of pure methamphetamine as well as a legislative desire to address these harms with significant penalties." *United States v. Kaufman*, 2019 WL 3220571 (D. Me. July 17, 2019). Hecke was involved in the distribution of massive quantities of drugs in the community, and the Court is unwilling to substitute its judgment for that of the legislature. The PSR's quantity findings are reasonable, supported by the evidence, and constitute a conservative estimate of the extent of Hecke's culpability. His objections to the quantity calculations are OVERRULED.

## CONCLUSION

---

[10] The Court notes, however, that even starting with a base offense level of 34, the Court has overruled Hecke's objections to the 6 levels of enhancements he received (and he did not object to the maintaining a drug premises enhancement). So even at a starting point of 34, with 8 more levels, he would be at an offense level of 42. With a criminal history category of II, his guidelines range would be 360 months to life, followed by 25 years consecutive on the 924(c) count.

Based on the above findings, the Defendant's objections to the PSR (ECF No. 202) are OVERRULED. The Court will schedule this matter for a sentencing hearing by separate entry.

SO ORDERED on May 4, 2023.

                                          s/ Holly A. Brady
                                          JUDGE HOLLY A. BRADY
                                          UNITED STATES DISTRICT COURT